# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| KENNETH E. ISAAC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION 16-0179-WS-C |
| | ) |
| WAL-MART STORES EAST, LP, | ) |
| | ) |
| Defendant. | ) |

## ORDER

This matter comes before the Court on defendant's Motion for Summary Judgment (doc. 39). The Motion has been briefed and is now ripe for disposition.

**I. Background Facts.**

*A. Plaintiff's Employment at Walmart.*

Virtually none of the relevant facts are in dispute.[1] Plaintiff, Kenneth E. Isaac, has been employed continuously as a full-time employee at Walmart Store #1212 in Saraland, Alabama, at all relevant times. (Doc. 40, ¶ 2.) Isaac was hired as a maintenance associate, but was later assigned the job of "Assembler." (Churchman Dep. (doc. 41, Exh. B), at 20-21.) As an Assembler, Isaac's duties included assembling bicycles, grills, furniture, tables and the like, and performing maintenance functions such as hanging items or repairing things. (*Id.*; Isaac Dep.

---

[1] In support of its Motion for Summary Judgment, defendant submitted a "Statement of Material Facts" consisting of paragraphs numbered 1 through 23, with #4 being omitted. (Doc. 40, at 2-6.) In his Response, plaintiff represents that he "agrees to the undisputed facts contained in Walmart's Statement of Material Facts written in paragraphs A 1-3, B 5-10, D 14-17, E 18-23 [*sic*], and F 23." (Doc. 48, at 1.) Accordingly, all facts set forth in those numbered paragraphs are treated as undisputed for purposes of this Order, pursuant to Rule 56(e), Fed.R.Civ.P. As to any facts that are in dispute, the Court will construe the record in the light most favorable to the nonmoving party. *See Smith v. LePage*, 834 F.3d 1285, 1296 (11th Cir. 2016) ("where there are varying accounts of what happened, the proper standard requires us to adopt the account most favorable to the non-movants") (citations and internal quotation marks omitted). Thus, plaintiff's evidence (to the extent he offers any) is taken as true and all justifiable inferences are drawn in his favor.

(doc. 41, Exh. A), at 29.) Historically, Assemblers at Store #1212 work eight-hour shifts. (Churchman Dep., at 30.) Much of the time, Isaac was the only Assembler working at Store #1212, so he would receive all the work hours for that area; thus, he routinely worked 40 hours per week. (*Id.* at 31; Isaac Dep., at 80.)

In 2011, Isaac suffered a back injury while unloading a truck, and underwent surgery for that injury in February 2012. (Isaac Dep., at 29-30; Johnson Dep. (doc. 41, Exh. D), at 43-44.) Following that surgery, Walmart placed Isaac on a light-duty assignment until early September 2014. (Isaac Dep., at 29-30.) At that time, Isaac's treating physician released him to return to full duty as an Assembler, without restrictions. (Johnson Dep., at 44-45.) On September 4, 2014, Isaac signed a copy of the Assembler job description, confirming his ability to perform the essential functions of the position with or without reasonable accommodation. (*Id.* at 45-46; Isaac Dep., at 56-58 & Exh. 7.) Days later, however, Isaac informed Walmart officials that he had re-aggravated his back injury while assembling furniture, specifically a "pretty heavy table." (Isaac Dep., at 68; Johnson Dep., at 47.)

### B. *The Temporary Alternative Duty Assignment.*

On September 11, 2014, Isaac's physician, Dr. Terry Taylor, released him to return to work with the following restrictions: "no lifting over 40 lbs. No repetitive bending and twisting may not be performed." (Isaac Dep., at 69 & Exh. 8.) Consistent with the limitations enumerated by Dr. Taylor, Walmart identified the full-time position of "People Greeter" as one that Isaac could perform, and offered him a Temporary Alternative Duty ("TAD") Assignment to that position at Store #1212. (Isaac Dep., at Exh. 8; Johnson Dep., at 47-48.) Unlike the Assembler job, the People Greeter position does not require lifting of substantial weight. (Johnson Dep., at 48.) On September 10, 2014, Isaac signed a document confirming, "I ACCEPT the Temporary Alternate Duty (TAD) position being offered to me." (Isaac Dep., at Exh. 8.)[2] Isaac has worked at Store #1212 in accordance with that TAD assignment to the

---

[2] Plaintiff correctly points out that this preprinted form also had a box giving Isaac the option of refusing the proposed TAD assignment. The "I REFUSE" box (which Isaac did not check) included verbiage reflecting that in the event of such refusal, (i) the employee's "benefits could be suspended or denied due to noncompliance," and (ii) "[r]efusal may also be classified as job abandonment resulting in possible termination of employment." (Isaac Dep., Exh. 8.) There is zero record evidence that these statements had any effect on Isaac's decision to accept the TAD assignment.

position of full-time People Greeter from September 2014 through the present. (Johnson Dep., at 48; Isaac Dep., at 69.) The People Greeter position pays a lower hourly wage than the Assembler position. (Isaac Dep., at 49.)[3] Nonetheless, throughout the period of Isaac's TAD assignment, including the present day, Walmart has continued to compensate him at the higher Assembler rate, with no pay cut whatsoever to reflect the People Greeter duties Isaac was actually performing. (*Id.* at 49-51.)

   C. *Plaintiff's Scheduling Issues.*

Although his rate of pay remained steady, Isaac did experience a minor difference between the People Greeter position and the Assembler position in terms of scheduling. This difference lies at the heart of Isaac's discrimination and retaliation claims against Walmart in this lawsuit. Scheduling at Store #1212 is generated using an automated system based on the store's weekly sales projection and the number of associates available to work in each area. (Johnson Dep., at 52, 57-58; Churchman Dep., at 30, 37-38.) The schedule is automatically prepared by computer in the first instance, not by a person. (Johnson Dep., at 54.) The more employees available to work in a given area, the fewer hours the auto-generated schedule assigns to each of those employees. (*Id.* at 52.) The automated schedule is generated three weeks in advance, after which Walmart managers at the store level confirm sufficient coverage for their shifts and finalize the schedule. (Wilson Dep., at 20; Churchman Dep., at 38.) Employees who are dissatisfied with the number of hours they have been assigned may speak to their immediate supervisor and successive levels of management, as needed, to request modifications. (*Id.*, at 21.) At Store #1212, employees approach store officials every day with complaints or requests about their scheduled work hours. (Johnson Dep., at 56.)

Unlike Assemblers, whose shifts consistently span eight hours at Store #1212, Greeter shifts vary in length and may be five, six, seven or eight hours, depending on what the scheduling system automatically generates in a particular week. (Churchman Dep., at 30, 38.) And again, a key variable utilized in auto-generating a schedule is the number of employees available to work in a given department. As noted, most of the time Isaac was the only

---

   [3] In particular, the People Greeter position is classified as pay grade 1, whereas an Assembler would be pay grade 3, with a difference of approximately $0.40 to $0.50 per hour. (Churchman Dep., at 29.)

Assembler assigned to Store #1212; by contrast, there are normally nine People Greeters employed at that location. (Johnson Dep., at 58.) A byproduct of these facts is that an Assembler at Store #1212 is more likely to be assigned 40 hours on the schedule than a People Greeter would be, simply because there are numerous People Greeters vying for the same shifts, but only one Assembler. (*Id.*)

This is precisely what happened to Isaac following his acceptance of a TAD assignment as a People Greeter in September 2014.[4] Unlike the 8-hour shifts he consistently received when working as an Assembler (for a 40-hour work week), Isaac often received shorter shifts as a People Greeter, resulting in totals of less than 40 (but more than 34) hours per week. (Churchman Dep., at 28-30, 32-34.) The sole reason for this shortfall was the auto-generated schedule because door greeter shifts are not uniform. (Johnson Dep., at 54; Churchman Dep., at 38.) On more than 10 occasions, Isaac approached Store #1212 co-manager Randy Scott Johnson, Jr., to request additional hours to increase his total to 40 hours in a particular workweek, because the schedule would show him as being up to four hours short of 40. (*Id.* at 52-53.) Each time, Johnson assured Isaac that he would take care of the problem. (*Id.* at 52.) And each time, Johnson in fact adjusted Isaac's hours for that particular week and gave him the additional hours he requested, addressing the issue to Isaac's satisfaction. (*Id.* at 58; Isaac Dep., at 95, 103.)[5] Walmart payroll records confirm that Isaac has averaged slightly above or slightly below 40 hours per workweek in each of the last two years. (Isaac Dep., at 100-01, Exh. 14 (showing average of 39.92 hours per week in 2015) & 15 (showing average of 40.35 hours per week in 2016).) These figures are commensurate with Walmart's payroll records showing

---

[4] To be clear, Isaac's TAD assignment was for a full-time position as People Greeter. Walmart considers "full-time hours" to be weekly scheduling of 34 to 40 hours, and presented evidence that Isaac has always received full-time hours consistent with that definition. (Churchman Dep., at 28, 34.)

[5] In his Response to the Motion for Summary Judgment, Isaac acknowledges that "[a]t some point, Isaac stop [*sic*] coming to Johnson **because Walmart adjusted his hours to stop the problem**." (Doc. 48, at 3 (emphasis added).) By plaintiff's own admission, then, defendant voluntarily took appropriate remedial steps to give him the hours he wanted on an ongoing basis.

Isaac's average work hours in earlier years. (Isaac Dep., at 99-100, Exh. 12 (showing average of 40.26 hours per week in 2012).)[6]

### D. *The Complaint.*

On April 26, 2016, Isaac (while still employed as a full-time People Greeter at Store #1212, receiving 40 hours per week and being paid at the higher Assembler rate) filed the Complaint (doc. 1) against Walmart in this District Court.[7] Although the precise nature of Isaac's claims is not entirely clear from the face of the Complaint, he attached his EEOC Charge of Discrimination against Walmart. The EEOC Charge reflected that Isaac is bringing claims of disability discrimination and retaliation based on events beginning on September 12, 2014 (the date of the TAD assignment), and predicated on the following allegations:

> "On September 11, 2014, I was reinjured and placed on light duty as a Greeter effective September 12, 2014.
>
> "Since my reinjury, my hours have been reduced from to [*sic*] 32 hours per week. I believe my hours have been reduced because of my disability.
>
> "I believe I am being discriminated and retaliated against in violation of Title I of the Americans with Disabilities Act Amendments Act [*sic*] of 2008."

(Doc. 1, at 4.)[8] Thus, the sole claims that Isaac has joined in this action are claims of discrimination and retaliation under the Americans with Disabilities Act (the "ADA") arising

---

[6] There is no dispute about the accuracy of these records. Not only has Isaac expressly agreed to those facts in his summary judgment Response (doc. 48, at 1), but also he acknowledged in his deposition that "[t]he records, it shows the accurate hours that I worked." (Isaac Dep., at 101.)

[7] Isaac filed a cursory fill-in-the-blanks Complaint as a *pro se* litigant at that time. (*See* doc. 1.) Although Isaac came to be represented in this matter by retained counsel a few months later (*see* doc. 17), that counsel has never sought to amend the pleading. Thus, Isaac's initial *pro se* Complaint remains the operative pleading defining his claims against Walmart.

[8] Plaintiff echoed this theory of liability in the Report of Parties' Planning Meeting, wherein Isaac (by and through counsel) represented that the People Greeter assignment he received in September 2014 "complied with Plaintiff's medical restrictions. Plaintiff was employed as a People Greeter but was paid at the [higher] hourly rate of an assembler. … Plaintiff was initially working 40 hours per week. In 2014 and 2105 [*sic*] without any warning or explanation Plaintiff's hours were reduced to less than 40 hours per week." (Doc. 20, at 1-2.)

from the reduction of his weekly work hours following his acceptance of the TAD assignment in September 2014.[9]

## II. Summary Judgment Standard.

Summary judgment should be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a), Fed.R.Civ.P. The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has satisfied its responsibility, the burden shifts to the non-movant to show the existence of a genuine issue of material fact. *Id.* "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted). "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted). "Summary judgment is justified only for those cases devoid of any need for factual determinations." *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).

---

[9] Insofar as Isaac's summary judgment response may purport to raise other or different claims against Walmart (such as ill-defined and/or nonsensical claims that "Isaac was coerced into signing the TAD" or that paying Isaac the higher Assembler rate while he worked the People Greeter job was "another pretext for discrimination against Isaac due to his disability" (doc. 48, at 3-4)), black-letter law precludes him from doing so. *See, e.g., Dukes v. Deaton*, 852 F.3d 1035, 1046 (11th Cir. 2017) ("A plaintiff may not amend her complaint through argument in a brief opposing summary judgment.") (citation omitted); *Owen v. Corizon Health Inc.*, --- Fed.Appx. ----, 2017 WL 3393827, *2 n.5 (11th Cir. Aug. 8, 2017) ("We do not consider this claim because Owen failed to allege it in his amended complaint, and instead raised it for the first time in response to the defendants' summary judgment motion."). Accordingly, any other claims and theories propounded for the first time in plaintiff's summary judgment brief cannot and will not be recognized here.

### III. Analysis.

There being no direct evidence of discrimination, Isaac's claim that Walmart discriminated against him on the basis of a disability is governed by the traditional *McDonnell Douglas* burden-shifting analysis. *See, e.g., Holly v. Clairson Industries, L.L.C.*, 492 F.3d 1247, 1255 (11th Cir. 2007) ("Under the controlling law in this Circuit, the burden-shifting analysis of Title VII employment discrimination claims is applicable to ADA claims.") (citation and internal marks omitted). Under this methodology, the initial burden rests with Isaac to establish a *prima facie* case of discrimination, after which the burden of production shifts to Walmart to articulate a legitimate non-discriminatory reason for the challenged action. *See Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1193 (11th Cir. 2004). Assuming a non-discriminatory reason is given, Isaac is "left with the ultimate burden of proving that [Walmart] intentionally discriminated against [him] because of [his] disability." *Id.* To establish a *prima facie* case of disparate treatment under the ADA, Isaac must show that: (i) he has a disability; (ii) he is a qualified individual; and (iii) Walmart discriminated against him because of his disability. *See, e.g., United States Equal Employment Opportunity Commission v. St. Joseph's Hospital, Inc.*, 842 F.3d 1333, 1343 (11th Cir. 2016) ("Establishing a *prima facie* case under the ADA requires a plaintiff to show that, at the time of the adverse employment action, she had a disability, she was a qualified individual, and she was subjected to unlawful discrimination because of her disability."); *Frazier-White v. Gee*, 818 F.3d 1249, 1255 (11th Cir. 2016) (similar).

The legal test is much the same for Isaac's claim of retaliation. To make out a *prima facie* case of retaliation under the ADA, a plaintiff must establish the following three elements: "first, the plaintiff engaged in statutorily protected conduct; second, the plaintiff suffered an adverse employment action; and finally, the adverse action was causally related to the protected expression." *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1336 (11th Cir. 1999) (elements of a retaliation claim are the same under ADA and Title VII); *see also Frazier-White*, 818 F.3d at 1258 (similar). "Once a *prima facie* case is established, the burden then shifts to the defendant employer to come forward with legitimate non-discriminatory reasons for its actions that negate the inference of retaliation." *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir. 1997). "The plaintiff must then demonstrate that it will be able to establish at trial that the employer's proffered non-discriminatory reasons are a pretextual ruse designed to mask retaliation." *Id.*

Isaac's claims against Walmart encounter insuperable obstacles at every step of the *McDonnell Douglas* analysis, whether viewed through the prism of a disability discrimination theory or a retaliation theory. As an initial matter, Isaac is unable to make out a *prima facie* case of discrimination or retaliation, for the simple reason that Walmart took no adverse employment action against him.[10] Again, the purportedly wrongful conduct that Isaac identifies in his Complaint (or, more precisely, in the EEOC Charge attached to his Complaint) is that his "hours have been reduced" by Walmart. The trouble is that plaintiff has identified no evidence to support that claim. By contrast, Walmart has submitted undisputed evidence that (i) Isaac's average hours worked remained consistently at or very close to 40 hours/week both before and after the TAD assignment to the position of People Greeter in September 2014; and (ii) while the auto-generated schedule sometimes resulted in Isaac being initially assigned to work approximately 36 hours (instead of 40 hours) in certain work weeks, Walmart managers modified the schedule upon request and gave Isaac all the hours he wished, and by Isaac's own admission "adjusted his hours to stop the problem" (doc. 48, at 3). These undisputed facts lead inexorably to the determination that Isaac's actual hours worked (as contrasted with the hours reflected on the preliminary, auto-generated schedule) were <u>not</u> reduced by Walmart after he was reassigned to People Greeter in a temporary light duty assignment following his reinjury to his back in September 2014. Yet the purported reduction in hours is the sole form of discriminatory or retaliatory conduct about which Isaac complains in the pleadings. Viewing the summary judgment record in the light most favorable to Isaac, his work hours were not reduced and he has, therefore, suffered no adverse employment action on which to base claims of disability discrimination or retaliation. Thus, his claims against Walmart fail for want of a *prima facie* showing.[11]

---

[10] "To establish a *prima facie* case of employment discrimination under the ADA, a plaintiff must show that, **at the time of the adverse employment action**, he had a disability, he was a qualified individual, and he as subjected to unlawful discrimination because of his disability." *Mazzeo v. Color Resolutions Int'l, LLC*, 746 F.3d 1264, 1268 (11th Cir. 2014) (emphasis added).

[11] In so concluding, the Court has considered Isaac's evidence that preliminary schedules showed he was assigned fewer than 40 hours as a People Greeter. (Doc. 48, at 3.) What matters for purposes of an "adverse employment action" analysis, however, is not the preliminary, unadjusted schedules generated by computer, but rather the actual hours that Isaac (Continued)

Even assuming that Isaac could establish a *prima facie* case of disability discrimination or retaliation (which he cannot), his claims still fail as a matter of law. Walmart has handily met its modest of burden of production by articulating a legitimate, nondiscriminatory (and nonretaliatory) reason why the initial schedules for Isaac assigned him fewer weekly hours as a People Greeter than they did when he was working as an Assembler. In particular, Walmart has demonstrated via undisputed evidence that it utilizes an auto-generated system to schedule employee work hours at Store #1212, and that the number of available employees in a given department is a significant factor in that auto-generation process. Walmart has further shown via undisputed evidence that Isaac was the only Assembler at Store #1212 (thereby enabling him to receive eight-hour shifts and 40-hour workweeks as a matter of course), but that he was one of nine People Greeters at that location (resulting in Isaac – like all the other People Greeters – being assigned fewer than 40 hours/week on the auto-generated schedule). And of course, the auto-generated schedule was subject to modification upon employee request. Everyone agrees that Walmart adjusted Isaac's hours upward every single time he made a request, and that his average weekly hours worked during the relevant time period were almost exactly 40. This evidence satisfies Walmart's burden of production.

Isaac has come forward with neither evidence nor remotely persuasive argument supporting an inference that Walmart's stated reasons for scheduling Isaac's hours the way it did

---

worked after any adjustments to the schedule by Walmart managers. And defendant has shown via undisputed evidence that Isaac's average actual hours worked hovered within an eyelash of the requisite 40 hours/week both before and after the September 2014 TAD assignment to the position of People Greeter. Also, insofar as Isaac balks in his summary judgment Response that Walmart "coerced" him to "surrender[] the assembler position" and accept a People Greeter position that "would subject Isaac to the winds [*sic*] of the forecast" (doc. 48, at 3-4), those claims are not properly joined in this action because they are not included in the Complaint or any amendments thereto. Even if they were, there is no evidence of such "coercion," no evidence that Isaac was forced to "surrender" his Assembler job permanently (as opposed to temporarily, while Walmart accommodated his back injury via a light duty assignment as People Greeter while still paying him at the higher Assembler rate), and no evidence that Isaac's actual hours worked were subject to the whims of any forecast (when he could and routinely did have those hours adjusted upwards to 40 upon request, no matter what the forecast said). Simply put, there are no record facts supporting a reasonable inference that Isaac ever suffered an adverse employment action at Walmart's hands; therefore, his discrimination and retaliation claims fail as a matter of law.

were actually a pretext for unlawful disability discrimination or retaliation. There is no evidence that Walmart's scheduling system functioned any differently for Isaac than it did for any other People Greeter at Store #1212, or any other employee in general. There is no evidence that Walmart manipulated its scheduling system in a manner to disadvantage Isaac. To the contrary, all evidence in the summary judgment record reflects that (i) Walmart effectively accommodated Isaac's functional limitations after he reinjured his back by giving him a light-duty assignment in the People Greeter position, consistent with all doctor-imposed restrictions on his ability to work; (ii) Walmart has gone well above and beyond its legal obligations by continuing to pay Isaac at the higher Assembler hourly rate throughout the time that he has worked as a People Greeter; and (iii) Isaac has continued to work an average of almost exactly 40 hours per week throughout the relevant time period, with Walmart managers increasing his hours in a particular week upon request whenever the auto-generated schedule shorts him a few hours. These undisputed facts are irreconcilable with any notion of disability discrimination or retaliation, and underscore Isaac's inability to show pretext. There are no genuine issues of material fact here. Isaac's claims are not only devoid of factual support, but they are also negated by an avalanche of undisputed facts demonstrating that Walmart has treated him in an eminently fair, equitable and nondiscriminatory manner.

**IV.     Conclusion.**

For all of the foregoing reasons, defendant's Motion for Summary Judgment (doc. 39) is **granted**. This action is **dismissed with prejudice** in its entirety. A separate Judgment will enter.

DONE and ORDERED this 7th day of December, 2017.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE